**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Raymond P. Moore**

Civil Action No. 19-cv-00941-RM-TPO

DENNIS L. BROWN, an individual; and
PAUL D. BROWN, and individual,

       Plaintiffs,

  v.

BRADLEY J. TENNISON, an individual;
FREDERICK ARIAS, an individual;
TENNISON INVESTMENTS, INC., an Arizona corporation;
SHIELD DEFENSE SYSTEMS, INC., a Nevada corporation;
THE JOSEPH PROJECT, a Nevada unincorporated association; and
JOHN DOES NUMBERS ONE THROUGH THREE,

       Defendants.

---

**ORDER FOR FINAL DEFAULT JUDGMENT**

---

This matter comes before the Court following the filing of Plaintiffs' Motion for Default Judgment and Memorandum of Points and Authorities (ECF No. 187), after the entry of Clerk's Default against Defendants (a) Bradley J. Tennison ("Mr. Tennison"); (b) Frederick Arias ("Mr. Arias"); (c) Tennison Investments, Inc. ("Tennison Investments"); (d) Shield Defense Systems, Inc. ("Shield Defense"); and (e) The Joseph Project ("TJP") (collectively, "Defendants"). After reviewing the evidence and evaluating all pleadings and exhibits on record in this action, the Court finds that default judgment shall be entered in favor of Plaintiffs and against Defendants, in the amounts and for the relief set forth below, for the reasons set forth in this Order.

I.      **FINDINGS OF FACT**

     A.      **Background to the Claims**

This case arises out of a scheme in which the Browns were lured into investing nearly
$4,850,000.00 in an investment vehicle called "The Joseph Project" ("TJP"), with promises of
the complete security of the Browns' investments, a very attractive rate of return for the Browns
and their families, and the opportunity for the Browns to contribute to humanitarian projects
worldwide.  The TJP investment turned out to be a scam, and the promises Defendants made
were fraudulent.

After the sale of the Browns' family business, Brown Brothers Asphalt and Concrete,
LLC, in September 2015 (*see* Pls.' Compl. [ECF No. 1], p.6), the Browns were introduced to
Mr. Tennison, who owned and operated Tennison Investments, and Mr. Arias, who owned and
operated Shield Defense, for the purpose of presenting the Browns with an investment
opportunity.  (*Id*., pp.15-16.)

In these meetings, in October, November, and December 2015, Defendants told the
Browns about TJP, which they described as a faith-based investment opportunity.  Mr. Tennison
told the Browns that, as a registered broker with the Financial Industry Regulatory Authority
("FINRA") and an investment advisor, he ran Tennison Investments and managed people's
money.  (*Id*.)  Defendants said TJP would provide certain specially selected investors with a
"100% plus" return on their investments after a year, in which the investors were described as
"asset providers" and the impressive profit as a "capital enhancement benefit."  (*Id*., pp.16-23.)
Capitalizing on the Browns' desire for a socially conscious investment, Mr. Tennison and

Mr. Arias said the investment would fund humanitarian projects worldwide and claimed to share the Browns' Christian beliefs and values. (*Id*., p.7-8, pp.17-18.)

Defendants told the Browns their investment funds would only be used as collateral for international sovereign currency and small cap trading activities, after-hours, and money invested in TJP would never be at risk. (*Id*., pp.16-21.) Mr. Tennison and Mr. Arias also told the Browns the 10% monthly return on their investments, in the form of "capital enhancement benefits," would be paid within 12 months. (*Id*., pp.18-23.) Mr. Tennison told the Browns he had invested $1,000,000 of his own money in an investment like TJP, which received a 10% rate of return per month, "like clockwork," and that he had invested $2,000,000 of his own money in TJP. (*Id*., p.18; pp.22-23.)

Defendants provided the Browns with various marketing materials (*see e.g.* Pls.' Compl., **Ex. 1** [ECF No. 1-1]; **Ex. 2** [ECF No. 1-2]), and conducted numerous meetings and conference calls, all intended to coax the Browns into investing in The Jospeh Project. (*Id*., pp.16-23.) Defendants stressed that, due to the highly confidential nature of TJP and its business activities, the Browns must not communicate with others lacking a need to know. (*Id*., p.22; p.25.) Relying on Defendants' assurances about TJP, the Browns made the decision to invest.

At Defendants' direction, on December 16, 2015, Dennis and Paul Brown each competed a "Participant Information Sheet," a "Non-Circumvention & Non-Disclosure Agreement," a "Letter of Non-Solicitation, Request & Accredited Participant," a "Deed of Trust," and a "Deed of Stewardship for Custodian Deposit Transaction" for TJP, all of which had been hand-delivered to the Browns in Colorado. (*See* Pls.' Compl., **Ex. 3** [ECF No. 1-3]; **Ex. 4** [ECF No. 1-4].) At Defendants' urging, each borrowed funds from lines of credit to invest in TJP. (*Id*.,

p.23.)  On December 24, 2015, Dennis and Paul Brown each authorized wire transfers to an account at Bank of America in the name of TJP, for $3,000,000.00 and $1,500,000.00, respectively.  (*Id.*, p.24.)

In mid-2016, Defendants sought additional money from the Browns, claiming they had not yet raised the minimum amount to complete TJP's "Minimum Asset Consideration" of $10,000,000, in order to proceed, and were short by $350,000.00.  (*Id.*, pp.25-26.)  Again, relying on Defendants' assurances about TJP, on September 9, 2016, Dennis and Paul Brown each authorized additional wire transfers, of $175,000.00 each, into TJP's account at Bank of America.  (*Id.*, p.26.)

In July 2017, the Browns inquired of Defendants about the status of their TJP investments.  (*Id.*, p.27.)  In response, Defendants advised that TJP was taking longer than anticipated but that everything was fine.  (*Id.*)  In furtherance of their scheme, Defendants then provided the Browns with a lulling payment, which Defendants referred to as a "cost to carry payment."  (*Id.*)  This, Defendants said, was to reimburse the Browns for some of the interest they were paying on lines of credit used to fund their respective investments in TJP.  (*Id.*)  On July 18, 2017, Mr. Arias's Shield Defense wired Dennis Brown $250,000.00 and, on July 27, 2017, it wired Paul Brown $125,000.00, purporting to be these "cost to carry payments."  (*Id.*)

In subsequent months, the Browns repeatedly inquired of Defendants as to the status of their investments in TJP and the promised capital enhancement benefits.  (*Id.*, p.28.)  While Defendants offered a variety of excuses, told the Browns to open Swiss bank accounts to receive their capital enhancement benefits, and repeatedly acted to assure the Browns with new dates on which they would receive the accrued but unpaid capital enhancement benefits, no substantive

information or return on their investments was ever provided.  (*Id.*)  It was only in mid-2018 that Mr. Tennison advised the Browns that he would only communicate with them through his attorneys at the Polsinelli, P.C. law firm, and the Browns learned that Mr. Tennison had been barred from selling securities by FINRA.  (*See* Pls.' Compl., p.30; **Ex. 5** [ECF No. 1-5].)

Dennis Brown invested a total of $3,175,000 in TJP.  (*See* D. Brown Afft., **Exhibit A** [ECF No. 187-1], at ¶10.)  Dennis Brown paid $929,618.31 in interest on the line of credit he utilized, at the urging of Defendants, to make the investment in TJP.  (*Id.*)  Dennis Brown's total gross compensatory damages are $4,104,618.31.  (*Id.*)  Paul Brown invested a total of $1,675,000 in TJP.  (*See* P. Brown Afft., **Exhibit B** [ECF No. 187-2], at ¶11.)  Paul Brown paid $477,539.05 in interest on the line of credit he utilized, at the urging of Defendants, to make the investment in TJP.  (*Id.*)  Paul Brown's total gross compensatory damages are $2,152,539.05.  (*Id.*)

In addition, the Browns incurred in excess of $529,648.66 in attorney fees and costs in seeking recovery of TJP investments.  (*See* Thomaidis Afft., **Exhibit C** [ECF No. 187-3], at ¶9; *see* Hawes Afft., **Exhibit D** [ECF No. 187-4], at ¶3.)  These fees and costs have been incurred since September 18, 2018, and the Browns split them equally.  (*See* **Ex. A**, at ¶11; **Ex. B**, at ¶12.)

The Browns received $645,000.00 in total settlement proceeds related to this matter, which proceeds were split after the payment of attorney fees by dividing them, 65.36% to Dennis Brown and 34.64% to Paul Brown.  (*See* **Ex. A**, at ¶12; **Ex. B**, at ¶13.)  Dennis Brown received $421,572.00 and Paul Brown received $223,428.00 of the settlement proceeds.  (*See* **Ex. A**, at ¶12 **Ex. B**, at ¶13.)

As discussed previously, Defendants returned $250,000.00 of Dennis Brown's funds, as what Defendants called a "cost to carry payment," although best described as a payment to lull Plaintiffs into believing TJP was legitimate.  (*See* **Ex. A**, at ¶8.)  Dennis Brown also received $497,696.81 from the State of Arizona, in a forfeiture action involving silver coins seized from Mr. Tennison and Mr. Arias, related to Defendants' activities with the fraudulently obtained funds.  (*Id.*, ¶14).  Dennis Brown has received occasional and *de minimis* restitution payments from Mr. Tennison, totaling less than $4,116.00.  (*Id.*)  And, as discussed previously, Dennis Brown received $421,572.00 in settlement proceeds related to this matter.  (*Id.*, ¶12.)  Thus, Dennis Brown's damages should be reduced by the sum of $1,173,384.81.

Similarly, Defendants returned $125,000.00 of Paul Brown's funds, in the form of a "cost to carry payment." (*See* **Ex. B**, at ¶9.)  Paul Brown also received $263,788.85 from the State of Arizona, in connection with the forfeiture action involving silver coins seized from Mr. Tennison and Mr. Arias.  (*Id.*, ¶15.)  Paul Brown has also received occasional *de minimis* restitution payments from Mr. Tennison totaling $1,947.83.  (*Id.*)  And, as discussed previously, Paul Brown received $223,428.00 in settlement proceeds related to this matter.  (*Id.*, ¶13.)  As such, Paul Brown's damages should be reduced by the sum of $614,164.68.

## B.    Procedural History

In an effort to recover their stolen investments in TJP, the Browns hired counsel on September 18, 2018 (*see* **Ex. A**, at ¶11; **Ex. B**, at ¶12), and commenced the instant action on March 29, 2019, asserting claims for securities fraud and aiding and abetting securities fraud, and control person liability, under the Colorado Securities Act, civil theft, negligence, participating in and aiding and abetting violations of the Colorado Organized Crime Control Act,

and piercing the corporate veil and reverse veil piercing, as to all Defendants, and breach of

fiduciary duty, as to Mr. Tennison and Tennison Investments.  (*See* Pls.' Compl., pp.34-52).  On

May 30, 2019, Mr. Arias and Shield Defense, were served using a private investigator, in

Kirkland, Washington.  (ECF Nos. 12, 13.)  On June 3, 2019, TJP, Tennison Investments, and

Mr. Tennison, were served by process server, in Tempe, Arizona.  (ECF Nos. 15, 16, 17.)

Mr. Arias, appearing *pro se*, for himself and as "director and beneficial interest holder of

the named legal person/corporation," requested an extension of time to file an answer, advising

the Court that "[a]s of this writing I have just been released from jail," on June 14, 2019.  (ECF

No. 18, pp.1-2.)  Mr. Arias fled, after being released from custody on bond, on June 13, 2019,

and remained a fugitive from justice during this case. (*See* https://www.fbi.gov/wanted/

wcc/frederick-arias; *see also* https://www.fbi.gov/wanted/wcc/frederick-arias/download.pdf, last

reviewed Oct. 2, 2024.)  Mr. Arias entered an appearance in this matter, and then failed to

respond to Plaintiffs' Complaint or otherwise participate in the action.  A Clerk's default was

entered against Mr. Arias, TJP, and Shield Defense on January 14, 2020.  (ECF No 68.)

Mr. Tennison, the owner and operator of Tennison Investments, pled guilty to the charge

of "Attempt to Commit Sale—Unregistered Securities," as part of a plea agreement in the State

of Arizona, on October 23, 2020, related to his participation in the scheme.  (*See, e.g.*, ECF

No. 80.)  Mr. Tennison and his company initially participated in this action, seeking multiple

extensions of time to file an answer, including *pro se*, "representing the Joseph Project" (*see*

ECF No. 21), and opposing entry of Clerk's default against "Defendant, Tennison Investments,

Inc. . . . an Arizona corporation whose Officer, Director and sole Shareholder is Bradley J.

Tennison" (*see* ECF No. 45, p.1), but ultimately defaulted, and failed to provide disclosures,

answer Plaintiffs' Complaint, or otherwise participate in the action (*see, e.g.*, ECF No. 103, pp.2-4).  A Clerk's default was entered against Mr. Tennison and Tennison Investments on March 30, 2021.  (ECF No. 105.)

## II.    JURISDICTION AND VENUE

### A.    Subject Matter Jurisdiction

This Court has subject matter jurisdiction over the Browns' claims pursuant to 28 U.S.C. §1332, as the parties are of diverse citizenship and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.  At the time this case was filed, the Browns were residents of Colorado.[1]  (*See* Pls.' Compl., pp.1-2.)  Mr. Tennison and Mr. Arias were residents of Arizona, and Tennison Investments and Shield Defense had principal places of business in Arizona, while Shield Defense is registered as a Nevada corporation.  (*Id*., p.2; pp.10-11.)  TJP had its principal place of business in Arizona.  (*Id*., p.2; p.12.)  As such, Plaintiffs are diverse in citizenship from all the defaulted Defendants.  And, set forth preliminarily in the Complaint, Plaintiffs' aggregated net principal investment was $4,475,000, and the amount of compensatory losses, notwithstanding other components, is much greater than $75,000.  (*Id*., p.3; p.34.)

Regarding Tennison Investments and Shield Defense, the federal diversity jurisdiction statute provides that "a corporation shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business." *Hertz Corp. v. Friend*, 559 U.S. 77, 80–81 (2010) (citing 28 U.S.C. § 1332(c)(1)).  In *Friend*, the United States Supreme Court concluded that the phrase "principal place of business" refers to the place where the corporation's high level officers direct, control, and coordinate the corporation's activities.

---

[1] Paul Brown has since relocated from Colorado to Florida. (*See* **Ex. B**, at ¶2.)

*Id*. at p.1186.  Mr. Arias's and Shield Defense's abrupt relocation to Washington does not destroy diversity.  (*See, e.g*., ECF No. 13.)

Regarding TJP, it is a Nevada unincorporated association, with its principal place of business in Arizona, and Defendants identified its members as Mr. Tennison and Mr. Arias, both citizens of Arizona. (*See* Pls.' Compl., p.2).  In determining citizenship of an unincorporated association for purposes of diversity, federal courts must include the entities' members. *See PMW, LLC*, 2024 WL 4267878, at *4 (citing *Siloam Springs Hotel, LLC v. Century Sur. Co*., 781 F.3d 1233, 1237–38 (10th Cir. 2015)).  Given its members are Mr. Tennison and Mr. Arias, TJP is a citizen of Arizona.

Accordingly, the Court finds that it has subject matter jurisdiction over the instant action.

**B.      Personal Jurisdiction**

The Browns may satisfy their burden of establishing personal jurisdiction by making a *prima facie* showing of personal jurisdiction.  *Id*. (citing *Dudnikov v. Chalk & Vermilion Fine Arts, Inc*., 514 F.3d 1063, 1070 (10th Cir. 2008)).  A court will accept the well-pled allegations of the complaint as true in determining whether Plaintiffs have made a *prima facie* showing that personal jurisdiction exists.  *Id*. (citing *AST Sports Sci., Inc. v. CLF Distrib. Ltd*., 514 F.3d 1054, 1057 (10th Cir. 2008)).  If the presence or absence of personal jurisdiction can be established by reference to the complaint, the court need not look further.  *Id*.  A plaintiff may also make this *prima facie* showing by putting forth evidence that, if proven to be true, would support jurisdiction over the defendant.  *Id*.

To determine if the federal court has personal jurisdiction, the Court must determine whether the exercise of jurisdiction comports with due process.  *Id*. at *5 (citing *Trujillo v.*

*Williams*, 465 F.3d 1210, 1217 (10th Cir. 2006)).  Given the Colorado long-arm statute, Colo.

Rev. Stat. § 13-1-124, has been construed to extend jurisdiction to the full extent permitted by

the Constitution, the jurisdictional analysis reduces to whether jurisdiction offends due process.

*Id*. (citing *Dudnikov*, 514 F.3d at 1070).  In determining whether assertion of jurisdiction over a

non-resident violates due process, Colorado has an important interest in providing a forum in

which its residents, such as the Browns, can seek redress for injuries caused by out-of-state

actors.  *Dudnikov*, 514 F.3d at 1063.  Where a defendant has minimum contacts with the forum

state, and where those contacts are such that assuming jurisdiction does not offend "traditional

notions of fair play and substantial justice," asserting personal jurisdiction is appropriate.  *PMW*,

2024 WL 4267878, at *5 (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).  Here,

the necessary minimum contacts are established under the doctrine of specific jurisdiction.

      1.   <u>Specific Jurisdiction</u>

     "Specific jurisdiction . . . is premised on something of a *quid pro quo*: in exchange for

'benefitting' from some purposive conduct directed at the forum state, a party is deemed to

consent to the exercise of jurisdiction for claims related to those contacts." *Beachley v. Palisades*

*Funding, Corp.*, No. 23-CV-03098-NYW-KAS, 2024 WL 1858498, at *3 (D. Colo. Apr. 29,

2024) (citing *Dudnikov*, 514 F.3d at 1078).  A "plaintiff's injury must 'arise out of or relate to'

the defendant's forum contacts."  *Compañía de Inversiones Mercantiles, S.A. v. Grupo Cementos*

*de Chihuahua S.A.B. de C.V.*, 970 F.3d 1269, 1284 (10th Cir. 2020).  As a division of this Court

notes in *PMW*, "there must be 'an affiliation between the forum and the underlying controversy,

principally, [an] activity or an occurrence that takes place in the forum State and is therefore

subject to the State's regulation.'"  2024 WL 4267878, at *6 (citing *Bristol-Myers Squibb Co. v. Sup. Ct. of Cal.*, 582 U.S. 255, 262 (2017)).

To establish specific jurisdiction, the Court must first determine whether Defendants have such minimum contacts with Colorado that they "should reasonably anticipate being haled into court" in Colorado.  *Id*. at *7 (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).  As part of this inquiry, the Court must determine whether Defendants purposefully directed their activities at residents of the forum, *Burger King*, 471 U.S. at 472, and whether Plaintiffs' claims arise out of or result from "actions by . . . defendant . . . that create a substantial connection with" Colorado.  *Id*. (citing *Asahi Metal Indus. Co. v. Sup. Ct. of Cal.*, 480 U.S. 102, 109 (1987)).  The activities "must show that the defendant deliberately 'reached out beyond' its home—by, for example, 'exploi[ting] a market' in the forum State or entering a contractual relationship centered there."  *Id*.  The Court must also determine if Defendants' actions create sufficient minimum contacts, considering whether the exercise of personal jurisdiction over Defendants offends "traditional notions of fair play and substantial justice."  *Asahi*, 480 U.S. at 105.  As part of this analysis, the Court should consider several factors, including: (1) the burden on Defendants; (2) Colorado's interest in adjudicating the dispute; (3) Plaintiffs' interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the states in furthering fundamental substantive social policies.  *See Burger King*, 471 U.S. at 477.

Here, beginning in September 2015, Defendants sought out Dennis and Paul Brown, residents of Colorado, and solicited them to invest in TJP.  (*See* Pls.' Compl., pp.5-6.)  Between October and December 2015, Defendants engaged the Browns in no fewer than five in-person

11

meetings, three prearranged Skype conference calls, and many telephone calls, in which

Defendants sought to have the Browns invest in TJP.  (*Id*.)  Defendants were aware the Browns

had sold their Denver, Colorado based company, Brothers Asphalt and Concrete, LLC, and had

received significant compensation from the sale.  (*Id*., p.15.)  In November and December 2015,

Mr. Tennison flew to Denver in order to meet with Dennis and Paul Brown, and their spouses, at

Brown Brothers Asphalt and Concrete, LLC's offices, in Centennial, Colorado, for the purpose

of soliciting investments in TJP.  (*Id*., p.20.)  On December 6, 2015, Mr. Tennison again flew to

Denver to hand deliver Defendants' "private placement documents" for TJP to the Browns.  (*Id*.,

p.21; *see also* Pls.' Compl., **Ex. 3** [ECF No. 1-3]; **Ex. 4** [ECF No. 1-4]).  On December 16, 2015,

another set of Defendants' documents for TJP were flown to Denver and hand delivered to

Dennis Brown.  (*Id*., p.23.)  Defendants, and particularly Mr. Tennison, then a registered FINRA

broker and investment advisor, knew Defendants were engaging in conduct contrary to the

Colorado Securities Act with respect to the investments of Colorado investors, and Defendants

failed to protect the Colorado-based assets from being misappropriated.  (*Id*., p.32.)  By engaging

in the conduct described in Plaintiffs' Complaint, Defendants made "offers" or "sales" of

securities in Colorado, pursuant to Colo. Rev. Stat. §11-51-201(13).  (*Id*., pp.34-43.)

Additionally, by engaging in the "enterprise" described in the Complaint, Defendants knowingly

participated in and conducted the enterprise through a pattern of racketeering activity in

Colorado, in violation of Colo. Rev. Stat. 18-17-104(3).  (*Id*., pp.46-50.)

     States have an interest in providing a forum in which their residents can seek redress for

injuries caused by out-of-state actors.  *OMI Holdings, Inc. v. Royal Ins. Co. of Canada*, 149 F.3d

1086, 1096 (10th Cir. 1998).  Under the circumstances present here, the test for minimum

contacts is whether Defendants' actions "'were expressly aimed at' the forum jurisdiction and

[whether] the forum jurisdiction was 'the focal point' of the tort and its harm." *Titan Feeding,*

*LLC v. Corey Cattle Co., LLC*, No. 19-CV-02541-PAB-SKC, 2022 WL 4182458, at *7 (D. Colo.

Sept. 13, 2022) (citing *Far W. Capital, Inc. v. Towne*, 46 F.3d 1071, 1080 (10th Cir. 1995)).

"[W]hen a defendant intentionally takes some action with the knowledge that the result will be

harm to a specific victim in another state, the picture involves more than mere foreseeability or

the likelihood that fortuitous and undirected conduct will have an effect in the state." *Far W.*

*Capital*, 46 F.3d at 1078; *see also Newsome v. Gallacher*, 722 F.3d 1257, 1264–65 (10th Cir.

2013) (explaining that minimum contacts for tort claims requires "(a) an intentional action that

was (b) expressly aimed at the forum state with (c) knowledge that the brunt of the injury would

be felt in the forum state").  Here, Defendants engaged in repeated intentional actions related to

TJP, which were expressly aimed at Colorado, with knowledge that the brunt of the injury would

be borne by the Browns in Colorado.  The Court finds that exercising personal jurisdiction over

these Defendants does not offend traditional notions of fair play and substantial justice, and that

the Court has specific personal jurisdiction over each of the Defendants.

2.    Service of Process

Finally, without proper service, the Court lacks personal jurisdiction over Defendants.

*Okla. Radio Assocs. v. Fed. Deposit Ins. Corp.*, 969 F.2d 940, 943 (10th Cir. 1992).  An

individual "may be served in a judicial district of the United States by . . . delivering a copy of

the summons and of the complaint to the individual personally."  Fed. R. Civ. P. 4(e)(2)(A).  A

corporation, partnership, or unincorporated association can be served "(A) in the manner

prescribed by Rule 4(e)(1) for serving an individual; or (B) by delivering a copy of the summons and of the complaint to an officer, a managing or general agent." Fed. R. Civ. P. 4(h)(1).

Plaintiffs have filed five proof of service documents, one for each of the defaulted Defendants (ECF Nos. 12, 13, 15, 17), and each of the Defendants entered an appearance and participated in this case (*see, e.g.*, ECF Nos. 18, 21, 45, 80). Through discovery, Plaintiffs learned that Mr. Arias dissolved Shield Defense on August 3, 2017, just over a year before Plaintiffs initiated this case. (*See* Nevada Sec. of State Filings, **Exhibit E** [ECF No. 187-5], at p.3). Plaintiffs also later learned that Mr. Tennison dissolved Tennison Investments during the pendency of this case, twenty days after he opposed entry of Clerk's default against the company, as its officer, director, and sole shareholder. (ECF No. 45; *see* Arizona Dept. of Revenue Cert. of Compliance, Tennison Investments, Inc., Aug. 14, 2019, **Exhibit F** [ECF No. 187-6].)

It is well established that a domestic corporation can be served properly by delivering a copy of the summons and complaint to "any agent authorized by appointment or by law to receive service of process." Fed. R. Civ. P. 4(h). In Colorado, dissolution of a corporation does not "prevent commencement of a proceeding by or against the corporation in its name," under Colo. Rev. Stat. § 7–114–105(2)(e). *Top Rank, Inc. v. Fey*, No. 08-cv-00480-RPM, 2009 WL 1384171, at *2 (D. Colo. May 15, 2009). Shield Defense and Tennison Investments have been properly served, by delivering a copy of the summons and complaint to their officers, Mr. Arias and Mr. Tennison, respectively. This Court finds that it has personal jurisdiction over each of the Defendants.

### III.     CONCLUSIONS OF LAW

In "ruling on a motion for default judgment, the court may rely on detailed affidavits or documentary evidence to determine the appropriate sum for the default judgment."  *PMW*, 2024 WL 4267878, at *3 (citing *Seme v. E&H Prof'l Sec. Co., Inc.*, No. 08-cv-01569-RPM-KMT, 2010 WL 1553786, at *11 (D. Colo. Mar. 19, 2010)).

As the Court notes in *PMW*, "even though modern rules of pleading are somewhat forgiving, 'a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory.'"  *Id.* at *4. (citing *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008)).  And, even after entry of default, the Court must consider "whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit conclusions of law."  *Id.*  Although "[s]pecific facts are not necessary" in order to state a claim, *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)), the well-pleaded facts must "permit the court to infer more than the mere possibility of misconduct."  *Id*. (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).  Once a court determines a sufficient basis for the claims in the pleadings, default should be entered and damages determined.  *Tripodi v. Welch*, 810 F.3d 761, 765 (10th Cir. 2016).

### A.     Securities Fraud/Violation of Colorado Securities Act, and Aiding and Abetting Securities Fraud in Violation of Colo. Rev. Stat. § 11-51-501 and Colo. Rev. Stat. § 11-51-604

Plaintiffs have established their claims against Mr. Tennison, Mr. Arias, Tennison Investments, Shield Defense, and TJP for securities fraud, under Colo. Rev. Stat. §§ 11-51-501 & -604.  (*See* Pls.' Compl., pp.34-40.)  Under § 11-51-604, Defendants are liable for "the

consideration paid for the security, together with interest at the statutory rate from the date of

payment, costs, and reasonable attorney fees, less the amount of any income received on the

security, upon the tender of the security, or . . . damages if the buyer no longer owns the

security"; "[d]amages are deemed to be the amount that would be recoverable upon a tender, less

the value of the security when the buyer disposed of it, and interest at the statutory rate from the

date of disposition."

Defendants are jointly and severally liable to Dennis Brown for his First Claim, in the

amount of $3,175,000.00 in damages, interest at the statutory rate from the date of the

investment in the amount of $2,229,402.74, attorney fees in the amount of $264,824.33, along

with post-judgment interest, reduced by $1,173,384.81 for sums received, for a total of

$4,495,842.26.  Defendants are jointly and severally liable to Paul Brown for his First Claim, in

the amount of $1,675,000.00 in damages, interest at the statutory rate from the date of the

investment in the amount of $1,171,430.13, attorney fees in the amount of $264,824.33 along

with post-judgment interest, reduced by $614,164.68 for sums received, for a total of

$2,497,089.78.

## B.    Control Person Liability Pursuant to Colo. Rev. Stat. § 11-51-604(5)(a), (b) and (c)

Plaintiffs have established that Mr. Tennison, Mr. Arias, Tennison Investments, Shield

Defense, and TJP were control persons who are jointly and severally liable to Plaintiffs to the

same extent as a primary person liable for securities fraud, pursuant to Colo. Rev. Stat. § 11-51-

604(5)(a), (b) and (c). (*See* Pls.' Compl., pp.40-43.)

Defendants are jointly and severally liable to Dennis Brown for his Second Claim, in the

amount of $3,175,000.00 in damages, interest at the statutory rate from the date of the

investment in the amount of $2,229,402.74, attorney fees in the amount of $264,824.33, and

post-judgment interest, reduced by $1,173,384.81 for sums received, for a total of $4,495,842.26.

Defendants are jointly and severally liable to Paul Brown for his Second Claim, in the amount of

$1,675,000.00 in damages, interest at the statutory rate from the date of the investment in the

amount of $1,171,430.13, attorney fees in the amount of $264,824.33, and post-judgment

interest, reduced by $614,164.68 for sums received, for a total judgment of $2,497,089.78.

### C.    Breach of Fiduciary Duty

Plaintiffs have established their claims for breach of fiduciary duty against Mr. Tennison

and Tennison Investments.  (*See* Pls.' Compl., pp.43-44.) Damages available for a breach of

fiduciary duty claim include "any economic losses which the plaintiff has had or will probably

have in the future," caused by the breach of fiduciary duty.  *See* CJI-Civ 26:5.  Additionally,

attorney fees from third party actions that could reasonably be anticipated to result from the

breach are proper as damages when the circumstances surrounding the breach are analogous to a

breach of trust.  *See Elijah v. Fender*, 674 P.2d 946, 951 (Colo. 1984) (citing *International State*

*Bank of Trinidad v. Trinidad Bean & Elevator Co*., 245 P. 489, 489 (1926) (attorney fees

recoverable as damages when "the natural and probable consequence of a wrongful act has been

to involve plaintiff in litigation with others")); *see also Buder v. Sartore*, 774 P.2d 1383, 1391

(Colo. 1989) (attorney fees properly recoverable for breach of fiduciary duty when case

analogous to breach of trust as exception to American Rule).

Plaintiffs had to expend attorney fees in seeking recovery for the Defendants' breaches of

trust in a related arbitration action before FINRA, as well as seeking to pursue their rights to

proceeds in multiple government forfeiture actions.  Not only are these attorney fees foreseeable

17

from Mr. Tennison's and Tennison Investments' breaches of their fiduciary duty to Plaintiffs,

these expenditures of attorney fees also resulted in recoveries that serve to reduce the ultimate

damages sought against Defendants by $1,406,485.66. (*See* Motion, pp.5-6.) Further, this

matter is analogous to a breach of trust action. Plaintiffs entrusted their investments to

Defendants and Defendants even referred to TJP as "The Joseph Project Trust," and advised

Plaintiffs that "[a]ll assets provided to the trust, shall be held in trust (untouched)." (*See* Pls.'

Compl., p.8, ¶46; **Ex. 1** [ECF No. 1-1].) TJP was also described by Defendants as a "Cestui que

Trust." (*Id.*, **Ex. 2** [ECF No. 1-2].) Throughout the documents provided to Plaintiffs,

Defendants repeatedly use the terms "trust" and "trustee," and Mr. Tennison signs accepting

what they call "Trustee powers." (*See, e.g.*, Pls.' Compl., **Ex. 3** [ECF No. 1-3], p.22; **Ex. 4** [ECF

No. 1-4], p.22.)

Mr. Tennison and Tennison Investments are jointly and severally liable to Dennis Brown

for his Third Claim, in the amount of $4,369,442.64 in compensatory damages (including

$264,824.33 in attorney fees as damages), reduced by $1,173,384.81 received, for a total of

$3,196,057.83. Mr. Tennison and Tennison Investments are jointly and severally liable to Paul

Brown for his Third Claim, in the amount of $2,417,363.38 in compensatory damages (including

$264,824.33 in attorney fees as damages), reduced by $614,164.68 received, for a total of

$1,803,198.70.

### D. Civil Theft in Violation of Colo. Rev. Stat. § 18-4-405

Plaintiffs have established that Mr. Tennison, Mr. Arias, Tennison Investments, Shield

Defense, and TJP are liable to Plaintiffs for civil theft pursuant to Colo. Rev. Stat. § 18-4-405.

(*See* Pls.' Compl., pp.44-45.) The Browns are entitled to treble damages, costs, and attorney fees

sustained as a result of the civil theft.  Colo. Rev. Stat. §18-4-405; *see Chavez v. Chavez-Krumland*, 520 P.3d 194, 206 (damages are trebled prior to any repayments).

Defendants are jointly and severally liable to Dennis Brown for his Fourth Claim, in the amount of $12,313,854.93 for treble damages, along with $264,824.33 for attorney fees and costs, reduced by $1,173,384.81 for sums received, for a total of $11,405,294.45.  Defendants are jointly and severally liable to Paul Brown for his Fourth Claim, in the amount of $6,457,617.15 for treble damages, and $264,824.33 for attorney fees and costs, reduced by $614,164.68 for sums received, for a total of $6,108,276.80.

### E.    Negligence

Plaintiffs have established their claims for negligence, as to Mr. Tennison, Mr. Arias, Tennison Investments, Shield Defense, and TJP, entitling Plaintiffs to compensatory damages for their negligence.  *Seaward Constr. Co. v. Bradley*, 817 P.2d 971, 975 (Colo. 1991).

Defendants are jointly and severally liable to Dennis Brown for his Fifth Claim, in the amount of $4,104,618.31 in compensatory damages, reduced by $1,173,384.81 for sums received, for a total of $2,931,233.50.  Defendants are jointly and severally liable to Paul Brown for his Fifth Claim, in the amount of $2,152,539.05 in compensatory damages, reduced by $614,164.68 for sums received, for a total of $1,538,374.37.

### F.    Participating In and Aiding and Abetting Violations of the Colorado Organized Crime Control Act, Colo. Rev. Stat. § 18-17-101, et seq.

Plaintiffs established their claims against Mr. Tennison, Mr. Arias, Tennison Investments, Shield Defense, and TJP, pursuant to the Colorado Organized Crime Control Act, C.R.S. §18-17-101, *et seq.* ("COCCA").  (*See* Pls.' Compl., pp.46-51.)  Plaintiffs are entitled to

treble damages, costs of investigation, attorney fees, and court costs.  *See* Colo. Rev. Stat. § 18-17-106.

Defendants are jointly and severally liable to Dennis Brown for his Sixth Claim, in the amount of $12,313,854.93 for treble damages, and $264,824.33 for attorney fees and costs, reduced by $1,173,384.81 for sums received, for a total of $11,405,294.45.  Defendants are jointly and severally liable to Paul Brown for his Sixth Claim, in the amount of $6,457,617.15 for treble damages, and $264,824.33 for attorney fees and costs, reduced by $614,164.68 for sums received, for a total of $6,108,276.80.

### G.    Piercing the Corporate Veil and Reverse Veil Piercing

Plaintiffs have established they are entitled to relief in the form of "veil piercing" and "reverse veil piercing," as to Mr. Tennison and Tennison Investments, as to Mr. Arias and Shield Defense, and as to Mr. Tennison and Mr. Arias and TJP.  (*See* Pls.' Compl., pp.51-53.) Accordingly, the individual Defendants shall be held liable for the acts of the entity Defendants, and the entity Defendants shall be held liable for the acts of the individual Defendants.

### H.    Claims Seeking Attorney Fees

Plaintiffs claims for relief include requests for attorney fees.  Accordingly, the Court reviews the attorney fees to determine reasonableness.  In determining whether attorney fees are reasonable, Courts consider factors such as:

> (1) whether the tasks being billed "would normally be billed to a paying client,"
> (2) the number of hours spent on each task, (3) "the complexity of the case,"
> (4) "the number of reasonable strategies pursued," (5) "the responses necessitated
> by the maneuvering of the other side," and (6) "potential duplication of services"
> by multiple lawyers.

*Robinson v. City of Edmond*, 160 F.3d 1275, 1281 (10th Cir. 1998) (quoting *Ramos v. Lamm*,

713 F.2d 546, 554 (10th Cir. 1983)).

Here, counsel for the Browns substantially discounted their respective hourly rates to

account for potential duplication of efforts, in addition to discounting the final sums billed to the

Browns.  Counsel frequently deferred payment on invoices for the Browns without charging

interest to permit the Browns to frequently pay fees after sums were received from their efforts.

The hours spent by counsel were substantial in this case, but given the complexity of the case,

the number of avenues counsel pursued to seek redress for the Browns, and the substantial

factual investigation required to assist the Browns with recovery, the hours expended were

reasonable.  The Court also notes that substantial sums were recovered by the Browns using such

attorney fees that served to significantly reduce the ultimate judgment against Defendants.  The

hourly rate of $300 per hour charged by counsel was a discounted rate that is reasonable and

takes into account the possible duplication of efforts, internal communications necessary to

pursue the Browns claims, and other factors.  Further, substantial efforts were necessitated by

Defendants efforts to avoid service, Defendants' demands for stays of this action that caused the

Browns to have to seek substantial discovery from alternate sources, and Defendants' ultimate

refusal to participate in the action even when the need for the stay was obviated.  Accordingly,

the Court determines that the Browns' attorney fees and costs were necessary and reasonable.

For the applicable claims, the Court awards Dennis Brown his attorney fees and costs in the

amount of $264,824.33 and Paul Brown his attorney fees and costs in the amount of

$264,824.33.

For the reasons set forth herein, the Court enters FINAL DEFAULT JUDGMENT against Defendants, inclusive of the following findings and relief, as follows:

A.  On Plaintiffs' First Claim for Relief, Mr. Tennison, Mr. Arias, Tennison Investments, Shield Defense, and TJP are jointly and severally liable to Dennis Brown in the net amount of **$4,495,842.26** and to Paul Brown in the net amount of **$2,497,089.78**;

B.  On Plaintiffs' Second Claim for Relief, Mr. Tennison, Mr. Arias, Tennison Investments, Shield Defense, and TJP are jointly and severally liable to Dennis Brown in the net amount of **$4,495,842.26** and to Paul Brown in the net amount of **$2,497,089.78**;

C.  Mr. Tennison and Tennison Investments are jointly and severally liable to Plaintiffs for their Third Claim for Relief to Dennis Brown in the net amount of **$3,196,057.83** and to Paul Brown in the net amount of **$1,803,198.70**;

D.  On Plaintiffs' Fourth Claim for Relief, Mr. Tennison, Mr. Arias, Tennison Investments, Shield Defense, and TJP are jointly and severally liable to Dennis Brown in the net amount of **$11,405,294.45** and to Paul Brown in the net amount of **$6,108,276.80**;

E.  On Plaintiffs' Fifth Claim for Relief, Mr. Tennison, Mr. Arias, Tennison Investments, Shield Defense, and TJP are jointly and severally liable to Dennis Brown in the net amount of **$2,931,233.50** and to Paul Brown in the net amount of **$1,538,374.37**;

F.  On Plaintiffs' Sixth Claim for Relief, Mr. Tennison, Mr. Arias, Tennison Investments, Shield Defense, and TJP are jointly and severally liable to Dennis

Brown in the net amount of **$11,405,294.45** and to Paul Brown in the net amount of

**$6,108,276.80**;

G.  Mr. Tennison and Mr. Arias are jointly and severally liable for the acts of Tennison

Investments, Shield Defense, and The Joseph Project, with respect to Plaintiffs;

H.  Shield Defense and The Joseph Project are jointly and severally liable for the acts of

Mr. Tennison and Mr. Arias, with respect to Plaintiffs; and

I.  This judgment shall include post-judgment interest.

DATED this 20th day of May, 2025.

BY THE COURT:

RAYMOND P. MOORE
Senior United States District Judge